Filed 6/25/26  In re McCowen CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re MARCIL McCOWEN<br><br>on Habeas Corpus. | E087834<br><br>(Super.Ct.No. FVA010377)<br><br>OPINION |

ORIGINAL PROCEEDINGS; petition for habeas corpus.  Gregory S. Tavill, Judge.  Petition granted.

Marcil McCowen, in pro. per.; and James M. Crawford, under appointment by the Court of Appeal, for Petitioner.

Rob Bonta, Attorney General, Lance E. Winters and Charles C. Ragland, Chief Assistant Attorneys General, Arlene A. Sevidal, Assistant Attorney General, Christopher P. Beesley, Michael D. Butera and Kristen Kinnaird Chenelia, Deputy Attorneys General, for Respondent.

# INTRODUCTION

Petitioner Marcil McCowen was convicted of first degree murder (Pen. Code,[1] § 187, subd.(a)) in 2001 and was sentenced to a term of 50 years to life in prison. His conviction was affirmed on direct appeal. In 2024, McCowen filed a petition for writ of habeas corpus in the San Bernardino County Superior Court, which was denied, followed by a petition for writ of habeas corpus on the same grounds in this court, where it was again denied, and then in the California Supreme Court, arguing that his conviction was based on false evidence. (§ 1473.) The Supreme Court issued an order to show cause returnable in this court.

The false evidence claim pertains to the testimony of a paramedic who testified at trial that the victim of the murder had sustained two gunshot wounds, one to the chest and one to the head, from which brain matter seeped. The People's theory of premeditated murder related to the multiple wounds, despite a pathologist's report indicating there was but one gunshot wound, which entered through the upper chest or neck, and exited from the upper back. The pathologist did not testify at trial, and the pathologist's report was not introduced into evidence at trial.

Upon transfer to this court, we appointed counsel for petitioner and directed the filing of a return by the People as well as a traverse by petitioner. Those pleadings having been filed, we grant the petition and remand the matter to the superior court for an evidentiary hearing.

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

BACKGROUND

We begin by reciting the facts from our unpublished opinion on direct appeal, *People v. McCowen* (Aug. 5, 2002, E030262) to which we add a summary of postconviction, postappeal proceedings:

"FACTUAL AND PROCEDURAL BACKGROUND

"On October 8, 1998, Myesha Kennedy, was celebrating her birthday with friends. Defendant was there, behind the entertainment center in the front room. Kennedy answered a knock at the door. It was victim, Diamond Anderson, and his friend Rodney Sanders. They told Kennedy they had not come to stay, but to show her victim's infant son and to deliver a birthday present, a bottle of brandy. Although victim and Sanders did not see defendant, he saw them through a crack in the door. Defendant said he did not want victim and Sanders around. When Kennedy continued to talk to them, defendant came from behind the entertainment center and picked up a semiautomatic handgun. He inserted a loaded magazine, saying he was 'about to dump on these niggers.' He walked to the front door, elbowed Kennedy out of the way and made a threatening remark to victim while raising and cocking the handgun. Victim either 'rushed' defendant or tried to back away and defendant shot him. Kennedy was hysterical and screaming, 'Why did you shoot him?' Victim tried to run, leaving a trail of blood from the scene of the shooting to the sidewalk. He was pleading for someone to take the baby. Defendant fired several more shots and victim fell. Victim was not holding his baby when he fell. Defendant fled the scene.

"Later that night, defendant called his girlfriend and told her that he had shot someone. He called her several times thereafter, but he never said he had acted in self-defense or as the result of a quarrel or because the victim had provoked him. After detectives talked to defendant's girlfriend, defendant told her that he was protecting himself when victim tried to do something. Defendant was apprehended in Colorado months later.

"At trial, Anderson, Kennedy and Sanders testified that victim was not holding anything, had not provoked the attack in any way and there was no quarrel. Kennedy explained that victim 'didn't do nothing [*sic*] threatening because he got shot … before he even seen [*sic*] [defendant], he got hit with a bullet. No way. [Victim's behavior] was never life threatening. No, no.'

"Victim's friend, Sanders, was in custody at the time of trial and had to be transported to court by the prison system. He testified that while he and victim were standing outside Kennedy's apartment talking to her, a man with a gun came to the door, cocked the gun, and asked, 'Are you Diamond Blue?' After the man cocked the gun, victim rushed the gunman to try to get the gun from him. It was too dark for Sanders to identify the gunman, but he did confirm that victim did nothing hostile or threatening, he had nothing in his hands, and the shooter fired several shots. Sanders heard four shots. He was holding victim's child when they approached the apartment and when victim was shot.

"Sanders also testified that he was placed in the same detention center with defendant to await the trial. Defendant called Sanders out by name and, in front of

4

defendant's friends, accused him of 'telling on [defendant's] case.' Sanders was scared because defendant started talking to him about the case and, on the bus ride to the courthouse, told him what to say on the stand. Defendant wanted Sanders to testify that victim was going to hit defendant with a bottle, but that was not what Sanders saw. Testifying against defendant put Sanders in danger and it was against his gang credo to cooperate with law enforcement.

"Defendant testified in his own behalf. He had known victim for several years and recognized victim's voice. He described their relationship as 'all right.' But he told Kennedy 'to get them out of there' because victim was 'crazy' and they were not 'getting along.' 'Around '94 [they were] friends' but victim 'stomped on [defendant's] sister while she was pregnant.' Defendant's sister committed suicide some time later, but defendant was not sure whether it was a matter of months or years. Defendant attempted to close the door, but victim saw him. Victim walked up to defendant's 'face, saying, "Oh, oh, oh, oh, what's up, Cuz? What's up, Cuz?"' Victim 'turned the bottle' as he approached defendant, so defendant drew a gun from his pocket to defend himself. Victim rushed him and the 'gun just went off.' He 'never intentionally fired no [*sic*] shots. … never intentionally pulled the trigger.' He was defending himself and the gun 'went off by accident.' He 'really … believed' he was 'protecting himself.' He 'considered it would be self-defense because [he] defended himself. But in the act of the gun going back off, [he] never intentionally fired no [*sic*] shots. [He] never intentionally pulled the trigger.' 'Accidental, it went off by accident. If someone comes rushing you with a bottle, out of natural fear, you know.' He called his mom and told her the victim

5

'tried to hit [him] in the head with a bottle and the gun went off and shot [the victim].' The prosecutor confronted defendant, saying every other witness had testified that victim had nothing in his hand and there had been no altercation, quarrel or aggression on his part. Defendant responded that the other witnesses were lying.

"The jury found defendant was guilty of first degree murder. ([§§] 187, subd. (a), 664, subd. (a) & 1192.7, subd. (c).) It found he personally and intentionally discharged a firearm, but he did not commit the acts to promote gang activities. (§§ 667.5, subd. (c)(8), 1192.7, subd. (c)(8), 1203.06, subd. (a)(1), 12022.5, subd. (a)(1), 12022.53, subds. (b), (c) & (d), 12022.5, subd. (a)(1) & 186.22, subd. (b)(4).) The court sentenced defendant to prison for 50 years to life." (*People v. McCowen, supra*, E030262.)

Defendant appealed, and we affirmed his conviction on August 5, 2002, in an unpublished opinion. (*People v. McCowen, supra*, E030262.) The Supreme Court denied review. (*People v. McCowen* (Oct. 16, 2002, S109640) [2002 Cal. LEXIS 7031].)

On January 9, 2024, McCowen filed a state habeas petition in the San Bernardino County Superior Court alleging claims of false evidence and prosecutorial misconduct, which were rejected. On May 29, 2024, petitioner filed a petition for writ of habeas corpus in this court, following the denial of his petition by the San Bernardino Superior Court, alleging his conviction was based on false evidence, within the meaning of section

6

1473, subdivision (b)(1)(A).[2] (*In re Marcil McCowen on Habeas Corpus*, E083962.) We summarily denied that petition on July 2, 2024.

McCowen then submitted a petition for writ of habeas corpus to the California Supreme Court on September 23, 2024, but due to matters raised during the section 1172.6 evidentiary hearing in the trial court, McCowen requested to withdraw the petition without prejudice, which was granted. McCowen subsequently filed a second petition for writ of habeas corpus in the California Supreme Court raising the same claims, to which the People filed an informal response, and McCowen filed an informal reply.

On February 2, 2026, the California Supreme Court issued an order to show cause returnable before this court as to whether the prosecution knowingly introduced false testimony in violation of *Napue v. lllinois* (1959) 360 U.S. 264 (*Napue*) and section 1473.

In accordance with the Supreme Court's order, this court ordered the appointment of counsel for petitioner, and directed the respondent, The Secretary of the Department of Corrections and Rehabilitation, to serve and file a formal return, addressing why petitioner is not entitled to relief on the grounds the prosecution knowingly introduced false testimony in violation of petitioner's due process rights under *Napue, supra*, 360 U.S. 264 and that false evidence was introduced at trial under section 1473, subdivision

---

[2] The petition alleges that a proceeding pursuant to section 1172.6 was pending at the time of filing the petition. An appeal was taken from the denial of the resentencing motion. (*People v. McCowen* (Sept. 8, 2025, E084949) [nonpub. opn.].) We have incorporated the record from the section 1172.6 appeal, *People v. McCowen, supra*, E084949, which includes the trial transcripts considered by the superior court in connection with petitioner's resentencing petition, into this writ proceeding.

(b)(l)(A). We also directed petitioner to serve and file a traverse to the return. Those pleadings have now been filed.

## DISCUSSION

The writ petition asserts that the paramedic's testimony constitutes false evidence presented by the prosecutor, which was relied upon by the People to argue the killing was deliberate and premeditated. The return, which becomes the principal pleading upon the issuance of an order to show cause (*People v. Romero* (1994) 8 Cal.4th 728, 738-739), alleges that the petition is procedurally barred, the prosecution did not knowingly present false evidence, and the testimony of the paramedic was not material. We do not agree that the petition is procedurally barred or that the paramedic's testimony was immaterial.

### 1. *Additional Background*

In addition to the testimony of the paramedic, summarized in the initial petition, and the closing argument (on rebuttal) of the prosecutor, there was other evidence that has a bearing on our determination.

For one thing, although Sanders, who accompanied the victim to the apartment where the shooting occurred, indicated he heard four shots, police located only one .380-caliber shell casing just inside the door. Additionally, although Sanders indicated the victim had nothing in his hands when they were outside and when petitioner drew his gun, he testified that he and the victim purchased a bottle of brandy before going to the apartment and the last time he saw the bottle in the victim's hands was when they exited their vehicle and walked to the door of the apartment. Later, the police found a liquor bottle, possibly held by the victim prior to the shooting, on the ground outside the front

8

door.  However, the trial transcripts reveal that neither Detective D. Im hof[3] nor

Detective M. Stark testified at trial.

2. ***Legal Principles Applicable to a Merits Review of a Petition for Writ of Habeas***

   ***Corpus***

Petitioner alleges that the prosecution's reliance on the paramedic's testimony,

which was contradicted by the actual coroner's report of the autopsy, resulted in a

conviction based on false evidence in violation of his due process rights.  (*Napue, supra*,

360 U.S. at p. 269.)  In the return, the People do not dispute that the paramedic witness

testified that the victim had suffered two gunshot wounds, one to the head, causing brain

matter to seep from the victim's head, which was contradicted by the coroner's report

(which was not admitted into evidence), demonstrating there was but one bullet wound to

the upper chest and no bullet wound to the head, which the coroner found to be intact.

However, the People assert there is no evidence the paramedic purposely lied or that the

prosecutor knowingly presented false testimony, and that the discrepancy was not

material.

The People also do not dispute that the prosecutor argued to the jury that the fact

two gunshots were fired into the victim supported a finding the petitioner committed a

deliberate and premeditated killing.  It is thus established as undisputed that false

evidence was proffered.  Despite the assertions there is no evidence the prosecutor

knowingly presented false evidence, the People have not proffered a declaration by the

---

[3] We are unsure if this spelling is a typographical error, but it is the way the name
appears on the report.

prosecutor to explain why the coroner was not called as a witness to establish the cause of death,[4] or why the autopsy report was not proffered, or that there was no evidence to show when or if the prosecutor possessed the autopsy report.

    a.  *Alleged Procedural Bars to Relief*

The People ask that we deny relief because his claim is procedurally barred under the contemporaneous objection rule, and the paramedic's testimony was not material.  In addition, the People argue that petitioner is prohibited from asserting the claims because he failed to purse them on direct appeal, citing *In re Sakarias* (2005) 35 Cal.4th 140, 169; *In re Dixon* (1953) 41 Cal.2d 756, 759.

Petitioner argues that the assertions of procedural default do not bar the presentation of the claims in these proceedings, citing *Glossip v. Oklahoma* (2025) 604 U.S. 226 (*Glossip*), in which the United States Supreme Court held that it is "the prosecution's duty to correct false testimony 'when it appears.' " (*Id*. at p. 253, fn.10, quoting *Napue, supra*, 360 U.S. at p. 269.)  Petitioner refers us to footnote 10 on page 253 of the opinion in *Glossip*, in which the court stated that "even if the defense had made a conscious choice not to raise the [issue of the false testimony], that would be irrelevant." (*Glossip, supra*, at p. 253, fn.10.)  Unless there is evidence from which it may be inferred that the petitioner was aware of the falsity of the evidence or that the

---

[4] Although the parties could have, and frequently do, stipulate to the foundational aspects for admission of an autopsy report (see, e.g., *People v. Johnson* (1951) 105 Cal.App.2d 478, 487), in this case the parties stipulated that the cause of death was a gunshot wound to the neck.  This stipulation does not obviate the error in introducing the paramedic's testimony which added an additional gunshot wound that the People would rely upon as evidence of express malice.

petitioner or his trial counsel possessed a copy of the coroner's report, we have no basis to infer that the petition raising the instant claims could have been raised in the trial court, or on direct appeal, or at any earlier time.

Petitioner alleged that the claim was being raised presently under the authority of Senate Bill No. 97, which went into effect on January 1, 2024, and allows for a writ of habeas corpus to be prosecuted on the additional bases of the discovery of new evidence that has not been previously presented and heard at trial and has been discovered after trial.  (§ 1473, subd. (b)(1)(A); 2023 Cal. Legis. Serv., Stats. 2023, ch. 381, §1; Sen. Bill No. 97 (2023-2024 Reg. Sess.).)  The People have not directly addressed this assertion, so we conclude that, in issuing the order to show cause, the Supreme Court found the petition was timely.

Petitioner also points to the fact that the California Supreme Court issued the order to show cause as a determination that there were no procedural bars to relief.  We agree that the issuance of the order to show cause was the Supreme Court's determination that the petition had stated a prima facie claim and that it was not procedurally barred.

In reviewing a habeas petition, the Supreme Court (or any other court considering such a petition) performs a gatekeeping function of determining "whether it states a prima facie case for relief and whether the stated claims are procedurally barred. [Citation.]  If the petition meets these requirements, the court must issue a writ of habeas corpus or order to show cause, receive a return and traverse, and may, if necessary, order an evidentiary hearing on the claims."  (*In re Cook* (2019) 7 Cal.5th 439, 457.)

The issuance of the order to show cause thus signaled that the petition was not procedurally barred. Our function is to receive the return and traverse and, if necessary, order an evidentiary hearing on the claims. (*In re Cook, supra*, 7 Cal.5th at p. 457.)

b. *Whether Petitioner Is Entitled to Relief*

(i) *General Legal Principles*

The Supreme Court's direction to an appellate court to issue an order to show cause why the relief sought in the petition should not be granted "signifies [its] '*preliminary determination* that the petitioner has made a prima facie statement of specific facts which, if established, entitle [petitioner] to habeas corpus relief under existing law.' " (*In re Serrano* (1995) 10 Cal.4th 447, 454-455, italics in original, citing, among other authorities, *People v. Duvall* (1995) 9 Cal. 4th 464, 475.)

The "issuance of the order to show cause creates a 'cause' giving the People a right to reply to the petition by a return and to otherwise participate in the court's decisionmaking process." (*In re Serrano, supra*, 10 Cal. 4th at p. 455.) It is through the return and the traverse that the issues are joined in a habeas corpus proceeding. (*Romero, supra*, 8 Cal.4th at p. 739.) "Once the issues have been joined in this way, the court must determine whether an evidentiary hearing is needed. If the written return admits allegations in the petition that, if true, justify the relief sought, the court may grant relief without an evidentiary hearing." (*Ibid*.) If the return and traverse reveal that petitioner's entitlement to relief hinges on the resolution of factual disputes, then the court should order an evidentiary hearing. (*Id*. at pp. 739-740.)

"[I]t is established that a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment, [citations]. The same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears. (*Napue, supra*, 360 U.S. at p. 269.) To establish a *Napue* violation, a defendant must show that the prosecution knowingly solicited false testimony *or* knowingly allowed it "to go uncorrected when it appear[ed]." (*Ibid.*; see *People v. Carrasco* (2014) 59 Cal.4th 924, 966-967.)

If the defendant makes such a showing, "a new trial is warranted so long as the false testimony 'may have had an effect on the outcome of the trial,' [citation]—that is, if it ' "in any reasonable likelihood [could] have affected the judgment of the jury," ' [citations]. In effect, this materiality standard requires ' " 'the beneficiary of [the] constitutional error to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.' " ' " (*Glossip, supra*, 604 U.S. at p. 246.) "Evidence can be material even if it 'goes only to the credibility of the witness.' (*Napue*, 360 U. S., at 269.)" In *Glossip*, the United States Supreme Court noted that "Had the prosecution corrected [the witness] on the stand, his credibility plainly would have suffered." (*Glossip*, *supra*, 604 U.S. at p. 248.)

*(ii) Analysis*

Turning to the merits, we have incorporated the record from petitioner's appeal from the denial of his petition for resentencing pursuant to section 1172.6, in *People v. McCowen*, *supra*, E084949, because the trial transcripts from petitioner's direct appeal (*People v. McCowen*, *supra*, E030262) were lodged with the trial court for consideration

in deciding the resentencing petition. Those transcripts were made a part of the appellate record in the appeal from the denial of that petition by way of augmentation. The reporter's transcript from the jury trial includes the testimony of the paramedic, which is recited in the petition for writ of habeas corpus at pages 9 to 10.

The People acknowledge that the paramedic witness testified that the victim sustained two gunshot wounds, one to the chest and one to the head, whereas the coroner's report contradicts this testimony, although that report was not admitted into evidence. The People now argue that it is possible the prosecutor did not have the coroner's report, but this statement is not supported by any evidence, so we have no basis to consider this as a factual assertion. Instead, the People do not dispute that false evidence was admitted, insofar as erroneous testimony was not corrected by the prosecution. In fact, the false evidence was central to the prosecution's closing argument to the jury.

The bottom line here is that there is no factual dispute that there is a significant discrepancy between the paramedic's testimony and the coroner's report, and that the People relied on the paramedic's false or erroneous, yet uncorrected, testimony to argue that having shot at the victim twice, the murder was willful, deliberate, and premeditated first degree murder.

Given the prosecutor's arguments at trial that repeatedly emphasized the two gunshot wounds to the victim as negating any claim of accident or self-defense, we must conclude that the paramedic's testimony was material. The results of the autopsy would have seriously undermined the paramedic's credibility, and, along with the findings of the

14

detectives who were dispatched to the scene of the shootings where they found but a single shell, would have precluded the People's closing argument for a first degree murder conviction based on the false evidence of two separate gunshot wounds.

Here the petition alleges that the paramedic witness falsely testified that the victim had two gunshot wounds, one to the head, from which brain matter coming out of the back of his head. This testimony was, at a minimum, erroneous and uncorrected, and at worst, intentionally false. From the evidence presented to us, we cannot determine which descriptor applies. The petition also alleges that the prosecutor committed misconduct, first, by presenting this testimony without correction, rather than presenting the coroner or pathologist's testimony as to the cause of death, and second, by relying on the false or misstated fact that there were two gunshot wounds to argue that the shooting could not have been an accidental discharge or self-defense. Because the Fontana Police Department submitted a narrative report describing the autopsy as well as the findings therefrom, we infer, without evidence to the contrary, that the prosecution was aware of the autopsy report and its results.

In this situation, we are ill-suited to make factual determinations. (*People v. Patterson* (2017) 2 Cal.5th 885, 901 ["Ordinarily, an evidentiary hearing is the appropriate means of resolving factual disputes of this nature"].) For this reason, we cannot simply order a new trial, and, instead, must remand the matter to the superior court with directions to conduct an evidentiary hearing to (1) the basis on which the paramedic based his testimony that there were two gunshot wounds; (2) whether the prosecution possessed the autopsy report and the police report summarizing the findings

15

of that report, and, if not, why; (3) whether the autopsy report was provided to petitioner's trial counsel in discovery, and, if not, why this would not constitute a *Brady* violation (ref. *Brady v. Maryland* (1963) 373 U.S. 83, 87); (4) why the false testimony of the paramedic was not timely corrected; (5) why Detectives Im hof and Stark did not testify about the evidence collected at the scene and the results of the autopsy; and (6) why a new trial should not be ordered.

### DISPOSITION

The petition for writ of habeas corpus is granted. The matter is remanded to the superior court with directions to conduct an evidentiary hearing in accordance with our opinion.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

<u>RAMIREZ</u>
P. J.


We concur:

<u>CODRINGTON</u>
J.
<u>RAPHAEL</u>
J.